United States District Court
Southern District of Texas
**ENTERED**
November 08, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| HEALTH FIRST HEALTH PLANS, INC., § § § Plaintiff. § § V. § § AMERICAN NATIONAL § INSURANCE COMPANY, § § Defendant. § | CIVIL ACTION NO. 3:20-cv-00226 |

## MEMORANDUM AND RECOMMENDATION

Pending before me are competing Motions for Summary Judgment filed by Plaintiff Health First Health Plans, Inc. ("Health First") and Defendant American National Insurance Company ("American National"). *See* Dkts. 57, 60. By stipulation, the parties have narrowed the issues they want decided at this juncture. *See* Dkt. 85. Having reviewed the briefing and the record, and considering the parties' oral arguments, I recommend that Health First's Motion for Summary Judgment (Dkt. 57) be **DENIED**, Part I of American National's Motion for Summary Judgment (Dkt. 60) be **GRANTED**, and judgment be entered in American National's favor.

## BACKGROUND

This is a reinsurance-coverage dispute.[1] Health First provides Medicare Health Maintenance Organization ("HMO") plans to its members. One of those members (the "Patient") required a bloodless heart transplant.[2] In 2015, Health

---

[1] "Reinsurance . . . has been described as the transfer of all or part of one insurer's risk to another insurer, which accepts the risk in exchange for a percentage of the original premium. The true reinsurer is merely an insurance company or underwriter which deals only with other insurance companies as its policyholders." *Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 848 (Tex. 2012) (cleaned up).

[2] "Bloodless cardiac surgery is a safe alternative for patients who have serious heart conditions but cannot or choose not to receive any blood or blood products (red cells,

First hired a third party to negotiate cost containment for the Patient's transplant. The result of this negotiation was an Individual Letter of Agreement ("ILA") between Health First, The University of Chicago Medical Center (the "Facility"), and The University of Chicago Physician Group (the "Physicians"). Under the ILA, Facility and Physicians charges were to be reimbursed by Health First as follows:

> <u>Evaluation/Pre-Transplant Care</u>: 60% billed costs
>
> <u>Transplant Care</u>: fixed case rate of $225,000 for the first $600,000, and 50% of all charges beyond $600,000

*See* Dkt. 58-2 at 1–2. Transplant Care covered services provided to the Patient starting the day before the transplant and ending at discharge.

The ILA was executed and took effect in 2015. But the Patient was not admitted to the Facility for transplant until November 29, 2017. The Patient remained at the Facility from the time of admission until the heart transplant on February 27, 2018. The Facility discharged the Patient on April 9, 2018. The total cost of the Patient's care from admission through discharge was $1,828,040.37.

In 2017, Health First's reinsurer was Munich Reinsurance American, Inc. ("Munich"). At some point in 2017, Munich decided to exit the HMO reinsurance market. Health First's agent and intermediary, Beecher Evergreen Managed Care, Inc. ("Beecher"), sent a request for proposal to the market. StarlineUSA, LLC ("Starline"), acting as a managing general underwriter for American National, worked with Beecher to put a reinsurance agreement in place (the "Agreement") between Health First and American National. Starline sent the final binder to Beecher on December 8, 2017. Health First countersigned the binder on December 11, 2017, binding coverage. Due to a "carry forward" provision, the Agreement was effective from December 1, 2017 through December 31, 2018.

On October 18, 2018, Health First submitted a claim for coverage under the Agreement for "all charges incurred . . . after December 1, 2017," the start of the

---

white cells, plasma or platelets)." *Bloodless Heart Surgery*, THE UNIVERSITY OF CHICAGO MEDICINE, https://www.uchicagomedicine.org/conditions-services/heart-vascular/heart-surgery/bloodless-heart-surgery (last visited Nov. 8, 2024).

effective period, for Patient's bloodless heart transplant. Dkt. 58-5 at 1; *see also* Dkt. 58-1 at 2. On December 17, 2018, American National denied Health First's claim on the basis that (1) all expenses negotiated under the ILA—the Facility's and the Physicians' charges—were deemed incurred on November 29, 2017—the date of the Patient's admission to the Facility and two days prior to the Agreement's effective term of coverage, and (2) any other charges that might have been covered fell below the $500,000 deductible threshold. Health First contested the coverage denial, and ultimately sued American National for breach of contract. Health First claims $1,145,236.33 in damages for its breach of contract claim.

Health First now moves for summary judgment, arguing that the Agreement clearly and unambiguously provides coverage for the Patient's expenses. American National also moves for summary judgment, arguing that it cannot have breached the Agreement because the bulk of the Patient's expenses are deemed incurred as of the date of the Patient's admission to the Facility, two days *prior* to start of the Agreement's term. American National advances several additional reasons for why it is entitled to summary judgment, but the parties have stipulated that they only want one all-or-nothing issue decided at this juncture: whether the Agreement clearly and unambiguously provides coverage for the Patient's expenses under the ILA.[3] For the reasons explained below, I find that it does not.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists if a

---

[3] *Compare* Dkt. 85 at 1–2 ("The Parties agree, and jointly ask, that the Court consider the following issues raised in the Parties' summary judgments: (1) Issue I in American National's Motion for Summary Judgment (Dkt. 60); and (2) Health First's Motion for Summary Judgment (Dkt. 57)"), *with* Dkt. 57 at 28 (requesting a ruling that American National pay Health First for the Patient's expenses minus only coinsurance and the deductible), *and* Dkt. 60 at 19 ("The clear and unambiguous terms of the Reinsurance Agreement and ILA show [the] Patient's expenses are treated as incurred on November 29, 2017, before the Reinsurance Agreement's term.").

reasonable jury could enter a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Evidence is viewed "in the light most favorable to the non-moving party, and the movant has the burden of showing this court that summary judgment is appropriate." *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009) (citations omitted).

## ANALYSIS

### A. PRINCIPLES OF INSURANCE LAW

The parties agree that Texas law governs this dispute. *See* Dkt. 58-3 at 16 ("This Agreement shall be governed as to performance, administration and interpretation by the laws of the State of Texas."). "Under Texas law, the same rules apply to the interpretation of insurance contracts as apply to the interpretation of other contracts." *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) (citations omitted). "Terms are given their ordinary meaning unless the insurance policy shows that the words were meant in a technical or different sense." *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 423 (5th Cir. 2010) (cleaned up).

I find the following guidance from the Fifth Circuit particularly salient:

> The rules in the Lone Star State for interpreting insurance policies have been around a *long* time. The paramount rule is that courts enforce unambiguous policies as written. We must honor plain language, reviewing policies as drafted, not revising them as desired. If an insurance contract, just like any other contract, uses unambiguous language, that's that. Our first task, then, is purely legal: deciding whether the Policy is ambiguous. And under Texas contract law, "ambiguity" means more than "lack of clarity." A policy is not ambiguous merely because different parties—or different judges—offer conflicting interpretations. If its wording can be given a definite meaning, then it is not ambiguous. A policy is only ambiguous if, giving effect to all provisions, its language is subject to two or more reasonable interpretations. Also, ambiguity must be evident from the policy itself; it cannot be fashioned via parol evidence. Finally, because we presume that contracting parties intended all that they enacted, we examine the entire contract in order to harmonize and give effect to all provisions so that none will be meaningless.

*Pan Am Equities, Inc. v. Lexington Ins. Co.*, 959 F.3d 671, 673–74 (5th Cir. 2020) (cleaned up). For the reasons discussed below, I conclude that the Agreement unambiguously provides that the Patient's expenses are treated as incurred on the date of admission—November 29, 2017.

**B.   THE ILA IS NOT THE MEMBER SERVICE AGREEMENT ("MSA").**

I must first address Health First's contention that "the MSA referenced by the [Agreement] is the ILA." Dkt. 57 at 10.

Whether the ILA is the MSA is relevant because the Agreement provides that American National will reimburse Health First 90 percent of "the Eligible Amount for a Member [that] exceeds the Deductible." Dkt. 58-3 at 11. Eligible Amount includes "health care services and supplies provided to a Member that," *inter alia*, "are covered by the MSA." *Id.* at 8. The Agreement defines the MSA as "the contract for covered services provided by [Health First] to a Member." *Id.* at 10. "Member means any contract holder . . . who is enrolled and eligible to receive services under an MSA and for whom reinsurance premium is paid." *Id.*

It is undisputed that the Patient is a Member. It is also undisputed that the Patient's Evidence of Coverage from Health First falls within the MSA definition. *See* Dkt. 72-4; *see also* Dkt. 96 at 22 (Health First's counsel agreeing that the Patient's Evidence of Coverage is "an MSA" because it "is part of the agreement of what the health plan would be providing specifically to its members"). Because the parties agree that the Evidence of Coverage is within the Agreement's MSA definition, I must read and construe the Evidence of Coverage together with the Agreement. *See Kartsotis v. Bloch*, 503 S.W.3d 506, 516 (Tex. App.—Dallas 2016, pet. denied) ("When a document is incorporated into another by reference, both instruments must be read and construed together.").

American National argues the ILA cannot be the MSA because the "MSA is Health First's member contract—its agreement obligating Health First to pay for its members' covered medical expenses." Dkt. 72 at 19; *see also* Dkt. 72-4 (evidence of the Patient's coverage). Moreover, American National points out that the

5

"Patient did not 'enroll' in the ILA, which is a vendor agreement strictly between Health First and [the Facility and Physicians] who would perform [the] Patient's transplant." Dkt. 72 at 21. I agree.

Health First counters that "because the ILA is a 'contract for covered services provided by [Health First] to a Member,' [it] neatly fit[s] the definition of a MSA." Dkt. 76 at 2 (quoting Dkt. 58-3 at 10). But the MSA definition refers to only one contract: "*the* contract." Dkt. 58-3 at 10 (emphasis added). That the Evidence of Coverage is the only document to define "covered services" suggests that it—and not the ILA—is *the* contract referenced in the MSA definition. According to the Evidence of Coverage, "'covered services' refers to the *medical care* and services and the prescription drugs available to [patients] as a member." Dkt. 72-4 at 6 (emphasis added). Health First—an insurer, not a medical care provider—does not provide "covered services" to the Patient. Accordingly, the MSA definition makes sense only if "provided by" refers to "the contract" that Health First provided to the Patient. Despite Health First's conclusory assertion to the contrary, *see* Dkt. 76 at 2 ("the ILA is a contract for covered services that Health First provided to the . . . Patient"), the only contract that Health First provided to the Patient is the contract for the Florida Hospital Employer Group POS B Plan. *See* Dkt. 72-4. Thus, the MSA is the contract between Health First and the Patient for the Florida Hospital Employer Group POS B Plan, not the ILA.

C. **THE PATIENT'S CHARGES WERE INCURRED ON THE DATE OF ADMISSION.**

The parties agree that the crux of the coverage issue here is "not whether the types of charges incurred are covered, but whether they were incurred *within* the [Agreement]'s effective period." Dkt. 57 at 16. Under the Agreement—specifically, under the second numbered sentence ("Sentence 2") of Eligible Amount—"in the case of a DRG[4] or other fixed case rate payments for inpatient services, all expenses

---

[4] DRG stands for "diagnosis-related group," which "is a patient classification system that standardizes prospective payment to hospitals and encourages cost containment initiatives." Dkt. 57 at 10 n.12 (quotation omitted).

from admission to discharge are recognized as incurred *on the date of admission*." Dkt. 58-3 at 8 (emphasis added). "Inpatient Hospital Services means those services provided by a Facility to a Member that is a registered inpatient in a Hospital, for which there is a room and board charge." *Id.* at 9.

It is undisputed that (1) the Facility is a Hospital; (2) the Patient was registered inpatient at the Facility/Hospital two days *before* the effective period; (3) the Patient remained a registered inpatient at the Facility/Hospital until discharge on April 9, 2018; and (4) the ILA provides a "Case Rate for Transplant Care (Includes Facility & Physicians Group)." Dkt. 58-2 at 2. Because the Patient was a registered inpatient at the Facility/Hospital continuously from admission on November 29, 2017 to discharge on April 9, 2018—and because a portion of that care was covered under a case rate—American National deemed all charges negotiated under the ILA "incurred on the date of admission of 11/29/17, which was prior to the inception of the Agreement," and denied Health First's claim. Dkt. 58-4 at 2. American National observed "that to the extent there may be covered charges other than the Facility and Physician's Group charges under the . . . ILA, they fall well below the $500,000 deductible." *Id.*

Health First contends, quoting the ILA, that "'[t]he Case Rate' only applies to 'inpatient facility and professional Transplant Care Health Services, supplies, and donor services' [because e]valuation and pre-transplant care is not part of the 'fixed case rate,' but is instead billed at 'sixty percent (60%) of Billed Charges.'" Dkt. 57 at 17 (quoting Dkt. 58-2 at 1–2). In other words, Health First wants American National to ignore the fact that there is only one date of admission and pay for all but two days of charges (November 29–30, 2017) because Evaluation/Pre-Transplant Care—a period during which the Patient was a

7

registered inpatient—was billed at a percentage and only Transplant Care was billed at a case rate. This interpretation is unreasonable.[5]

It is undisputed that the Reinsurance Agreement provides for reimbursement of physician services *only* for transplants[6] when "included as part of a global case rate" during Transplant Confinement. Dkt. 58-3 at 4. Transplant Confinement "begins one day prior to the Transplant and ends upon hospital discharge." *Id.* at 11. It is undisputed that the Patient's Evaluation/Pre-Transplant Care both included physician services *and* fell outside Transplant Confinement.[7] Thus—taking Health First at its word that American National is obligated to defer to the ILA's "phases" of care[8]—physician services during the Patient's Evaluation/Pre-Transplant Care should not be covered under the Agreement because they were rendered before the Transplant Confinement period. Yet, Health First seeks reimbursement for physician services from the Evaluation/Pre-Transplant Care period while disclaiming the one and only circumstance under which such services could be reimbursed: a global case rate. *See* Dkt. 96 at 67 (Health First's counsel stating, "We don't have a global case rate").

At oral argument, Health First billed this as a last-ditch argument made late in the game, *see* Dkt. 96 at 68, but it is no such thing. American National argued in its response to Health First's Motion for Summary Judgment:

> Health First's argument that it is entitled to payment of physician expenses under the ILA is also inconsistent with its argument that the ILA is not a fixed case rate payment. That is because the Reinsurance Agreement excludes coverage for physician services

---

[5] Because Health First does not advance a reasonable interpretation, I do not reach Health First's arguments regarding a court's obligation to apply the insured's reasonable interpretation over the insurer's reasonable interpretation. *See* Dkt. 57 at 22–23.

[6] Physician Services provided in an Emergency Out of Care Area or as a standalone service are listed as "Not Covered" in the Agreement. Dkt. 58-3 at 4.

[7] The Patient spent 89 days—from November 29, 2017 until February 25, 2018—as a registered inpatient at the Facility before Transplant Confinement began.

[8] American National is not obligated to defer to the ILA's phases of care because, as established above, the ILA is *not* the MSA.

8

> during transplant confinement, unless included as part of a global case rate. . . Therefore, if the Court agrees with Health First that the ILA is not a fixed case rate, Health First cannot recover expenses for physician services during [the] Patient's transplant confinement—even if they were part of Health First's ILA vendor agreement.

Dkt. 72 at 24–25. Health First failed to respond to this argument in its reply or during oral argument. Accordingly, Health First's interpretation—which would require reimbursement for physician services outside of Transplant Confinement, despite the Agreement expressly excluding such services—is unreasonable. Having established that Health First's interpretation is unreasonable, that ought to end the discussion because Health First concedes that American National's interpretation *is* reasonable. *See* Dkt. 96 at 71 (Health First's counsel stating that "[b]oth sides offer an interpretation that's reasonable"). Even so, I will demonstrate why American National's interpretation is correct as a matter of law.

As Health First notes, American National would construe Sentence 2 broadly so that "all expenses associated with the . . . Patient—regardless of whether they are based on a percentage (i.e. not a fixed rate) or not—are 'fixed case rate' payments and should be deemed as incurred on the date of admission." Dkt. 70 at 2. While this is surely a harsh result, it is the result dictated by the Agreement. It is undisputed that the entire payment for Transplant Care did *not* revert to a discounted rate, meaning the ILA's Case Rate for Transplant Care was a fixed case rate payment for inpatient services. Under the Agreement, "in the case of . . . fixed case rate payments for inpatient services, all expenses from admission to discharge are recognized as incurred on the date of admission." Dkt. 58-3 at 8. The phrase "all expenses" refers to inpatient services, not to fixed case rate payments.

This is the right interpretation because the Agreement contemplates fixed case rate payments for services *other* than inpatient services. Indeed, Fixed Fee does not refer to "inpatient services," but to "health care services." Dkt. 58-3 at 9. And throughout the Agreement, "health care services" is used more broadly than "inpatient services." Thus, fixed case rate payments for health care services *other*

9

than inpatient services are not deemed incurred on the date of admission. Accordingly, the primary subject of Sentence 2 is inpatient services, not DRG or other fixed case rate payments.

Health First contends "any case rate associated with the transplant care cannot be considered incurred by the date of admission since the Policy does not recognize the transplant period until the day before the transplant." Dkt. 70 at 2. But Transplant Confinement has nothing to do with when Eligible Amounts are deemed incurred. Transplant Confinement merely defines the time period during which American National will reimburse Health First for health care services that would not otherwise be included (*e.g.,* Physician Services, Transplant Acquisition Expense, and Travel Expense). In other words, because a portion of the Patient's single, uninterrupted inpatient stay was covered by a case rate payment that did not *entirely* revert to a discounted rate, Sentence 2 requires that all expenses relating to the Patient's inpatient admission—regardless of whether those expenses are part of the case rate payment—be deemed incurred as of the date of admission. Because it is undisputed that any charges that would otherwise be covered under the Agreement are less than Health First's deductible, American National does not owe Health First anything.

## CONCLUSION

For the reasons discussed above, I recommend that Health First's Motion for Summary Judgment (Dkt. 57) be **DENIED**, Part I of American National's Motion for Summary Judgment (Dkt. 60) be **GRANTED**, and judgment be entered in American National's favor. Because I considered only the ILA and the Agreement in making this recommendation, Health First's Motion to Strike (Dkt. 71) and American National's Motion for Leave to Supplement (Dkt. 79) are **DENIED AS MOOT**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R.

CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 8th day of November 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE